SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

ENTERPRISES SOLUTIONS, INC., Herbert S. Cannon, Dr. John A. Solomon, Defendants,

and

Rowen House, Ltd., and Montville, Ltd., Relief Defendants.

No. 00 Civ. 2685(MGC).

United States District Court, S.D. New York.

June 6, 2001.

Securities and Exchange Commission by Charles Stodghill, Carleasa Coates, Leo J. Kane, John Field, Washington, DC, for Plaintiff S.E.C.

Tighe Patton Armstrong Teasdale by Thomas Earl Patton, Washington, DC, for Defendant Herbert S. Cannon.

Martin & Adams by Kenneth A. Martin, Washington, DC, for Defendant John A. Solomon.

Corrigan & Morris by Stanley C. Morris, Los Angeles, CA, for Defendant John A. Solomon.

## OPINION

CEDARBAUM, District Judge.

This is a civil enforcement action brought by the Securities Exchange Commission ("the Commission") against Enterprises Solutions, Inc. ("ESI" or "the company"), its president and CEO John A. Solomon, and Herbert S. Cannon, whom the Commission alleges controlled the company. The Commission suspended trading of ESI stock on March 30, 2000, and instituted this suit shortly thereafter. The Commission named Rowen House, Ltd. and Montville, Ltd., both Gibraltar corporations, as relief defendants, alleging that they were also controlled by Cannon and used by him to sell thousands of shares of ESI stock at inflated prices. On

May 1, 2000, I granted the Commission's motion to freeze the assets of Rowen House and Montville held by the Manhattan brokerage firm Wall Street Equities, Inc. *S.E.C. v. Enterprises Solutions, Inc.*, No. 97 Civ. 0883(MGC) (S.D.N.Y. May 1, 2000) (order granting preliminary injunction).

The Commission alleges that ESI violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, by knowingly and intentionally failing to disclose in its November 18, 1999 Form 10-SB Registration Statement (the "Registration Statement") Cannon's involvement with the company, and the fact that C.E.A., Inc. had gone into bankruptcy while Solomon was its CEO. The Commission also alleges that ESI made material misrepresentations in press releases issued on March 14, 2000 and March 28, 2000, and on the ESI website. The Commission asserts both primary and control person liability against Solomon and Cannon for these violations.

On October 12, a consent judgment was entered against ESI, enjoining it from committing further securities violations. In connection with the consent judgment, ESI agreed, among other things, to produce documents and make witnesses available to the Commission. *S.E.C. v. Enterprises Solutions, Inc.*, No. 00 Civ. 2685 (S.D.N.Y. Oct. 12, 2000) (Consent Judgment against Enterprises Solutions, Inc.).

From January 8, 2001 through January 16, 2001, I conducted a bench trial of the Commission's claims against defendants Cannon and Solomon. The Commission presented as witnesses John Solomon, Jack Skidell, owner of the brokerage firm Colin Winthrop & Co., Inc., and Salvatore Cerruto, a stock trader at Wall Street Equities. In addition to the live testimony, the Commission submitted excerpts, agreed to by all parties, from the deposi-

tions of Herbert Cannon; Nina Cannon, former secretary and director of ESI and Herbert Cannon's daughter; Roger Schell, executive vice president and head of engineering at ESI; and Neal Milch, a freelance investor who had considered investing in ESI in late 1999 and early 2000. Defendant Cannon's deposition testimony consisted of invocations of the Fifth Amendment privilege against self-incrimination.

Defendants presented no witnesses.

## FINDINGS OF FACT

After examining all of the evidence, observing the demeanor of the witnesses who testified in the courtroom, and considering the credibility and plausibility of all the testimony, I make the following findings of fact.

### Background

ESI is a Nevada corporation that was originally incorporated in 1987 under the name Sedgewicke Business Alliance, Inc. In 1994, the company changed its name to American Casinos International, Inc. ("ACII") and entered the casino gaming business. In March 1999, the company changed its name to ESI. Following the change of its name to ESI, the company purported to be in the business of internet security software. Until the summer or early fall of 1999, however, ESI was merely a corporate shell with no employees or facilities. Wayne Kight was the nominal president of the company, but Herbert Cannon made most of the managerial decisions.

Herbert Cannon is the principal of HSC Consulting, Inc., a consulting firm based in Boca Raton, Florida. Until March 20, 2000, ESI retained Cannon and HSC Consulting to provide consulting services, for which Cannon received $3,000 a month.

At the time that the Registration Statement was filed with the Commission, Cannon owned an undisclosed number of shares of ESI common stock through his ownership of Worldnet Communications, Inc. and Romsley Ltd. The Commission proved by a preponderance of the credible evidence that, in addition to these shares, Cannon was the beneficial owner of a large number of ESI shares held by Rowen House, Ltd., Humphrey, Ltd., Montville, Ltd., Effingham, Ltd. and Coltmill, Ltd., Gibraltar companies that share an address at 1 Coral Road, Suite 2A, Gibraltar (collectively the "Gibraltar entities").

■ The documents establishing the accounts of the Gibraltar entities with the brokerage firms Colin Winthrop and Wall Street Equities were signed by "Elizabeth A. Plummer." Nevertheless, Jack Skidell and Salvatore Cerruto, the stock brokers who handled the accounts, testified that Cannon directed nearly all the purchases and sales of securities for those accounts. In addition, the signatures on several of the documents purportedly signed by Plummer are suspiciously different. Of the documents that were notarized, most were notarized in Palm Beach County, Florida, some by Cannon's wife. The most persuasive evidence of Cannon's ownership of the Gibraltar entities is a resolution of the ESI Board of Directors on February 7, 2000, which approved the issuance of 198,500 shares of restricted common stock to Rowen House "in repayment of the $198,500 loaned to the company, including the loan from HSC Consulting Inc." Thus, ESI repaid a loan from Cannon's consulting firm by issuing stock to Rowen House. When asked at his deposition whether he owned any equity interest in the Gibraltar entities, Cannon invoked the Fifth Amendment privilege against self-incrimination.[1]

---

1. Cannon's invocation of the privilege in a civil case permits the inference that he did, in

Further, Neal Milch testified that while he was considering investing in ESI in early 2000, Cannon told him that he owned 500,-000 of ESI's 5,200,000 outstanding common shares and 500,000 warrants to buy additional common shares.[2] As no other evidence has been offered to explain the manner in which Cannon owned those shares, the inference that he owned them through the Gibraltar entities is strengthened.

When ESI filed the Registration Statement with the Commission, Humphrey owned 275,001 shares, 5.9% of the outstanding common stock, and was the largest shareholder of ESI. Rowen House owned 244,168 common shares, 5.2% of the outstanding common stock.

Cannon has a history that precluded him from openly serving as an officer or director of ESI. In 1985, Cannon pleaded guilty to a charge of conspiracy to defraud the United States in the collection of income tax. In 1987, he was convicted under New York's larceny statute in connection with the mishandling of funds of a chartered bank, and he also pleaded guilty in those proceedings to two counts of failure to pay state income tax. In 1988, Cannon again pleaded guilty to one count of conspiracy to defraud the federal government. In 1994, he was sentenced by the United States District Court for the District of New Jersey to five years probation and 500 hours of community service, and ordered to pay $10,000 in court costs,

for selling fraudulent coal mine tax shelters to investors. The coal mines at issue did not engage in any actual mining operations. In 1988 and 1993, the Commission obtained civil judgments against Cannon enjoining him from further violating provisions of the securities laws. In addition, in August of 1987, the Commission issued an order barring Cannon from the securities industry.

John A. Solomon is the current president and chief executive officer of ESI. He began his employment with ESI on October 14, 1999. Prior to his employment with ESI, Solomon's principal management experience was with a private software company called CEA, Inc., for which he served as senior vice president of operations and, later, as chief executive officer. CEA went into bankruptcy in 1995, while Solomon was the CEO. Solomon personally entered bankruptcy shortly thereafter.

Between 1995 and 1999, Solomon worked as a consultant. In November 1996, he filed a disability claim for depression and anxiety with UNUM Life Insurance Co. of America and received approximately $6,400 per month in disability payments until at least April 2000. In late December 1999, despite having been nominally employed by ESI for more than two months, Solomon submitted an "Insured's Progress Statement" to UNUM in connection with his disability claim in which he represented that he had not en-

---

fact, own shares in ESI through the Gibraltar entities. *See Baxter v. Palmigiano*, 425 U.S. 308, 318–20, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (Fifth Amendment does not prohibit drawing adverse inferences when a party in a civil action invokes the privilege against self-incrimination); *LiButti v. United States*, 107 F.3d 110, 121 (2d Cir.1997). Cannon argues that the mere invocation of privilege, alone, may not support an adverse finding. *See United States v. Stelmokas*, 100 F.3d 302, 311 (3rd Cir.1996) (requiring independent evi-

dence to support adverse inference drawn from invocation of the privilege); *United States v. Village of Island Park*, 888 F.Supp. 419, 432 (E.D.N.Y.1995) (same). In any event, the Commission has presented sufficient independent evidence to support the adverse inference.

**2.** The Milch testimony was received as an admission of a party opponent only with respect to Cannon. Fed.R.Evid. 801(d)(2).

gaged in any occupation since his last report. On an April 17, 2000 Insured's Progress Statement, Solomon stated that he was "participat[ing] in running a high tech company" on a "part time basis." From October 1999 until at least April 2000, Solomon received disability payments from UNUM as well as compensation from ESI.

**Organization of ESI**

In the summer of 1999, while working on network security applications for Novell, Inc., Roger Schell, Rich Lee and Gary Baker put together an engineering plan to design internet security software. Schell was the senior engineer and had extensive experience in the field of computer security. He taught computer science at the Naval Postgraduate School after receiving his Ph.D. in 1971. He then served as deputy director of the Department of Defense ("DOD") Computer Securities Center. After leaving the DOD, he helped form Gemini Computers, a company specializing in computer security. He left Gemini in 1993 and, in 1994, joined Novell, Inc., a network operating system company. Lee and Baker worked under him at Novell.

The engineering plan involved taking existing security technology developed by Gemini and Novell and redesigning it for the Internet. After an unsuccessful relationship with Sistex, a wholly owned subsidiary of Infotex, a company for which Cannon had been a consultant, Schell was advised by Bob Pollock, president of Sistex, to talk to Cannon about obtaining capital from investors. Pollock also served ESI as a consultant.

In approximately June of 1999, Schell met with Cannon in Florida. At that meeting, Schell described his engineering plan to Cannon. Schell hoped to develop an Internet security product that could be certified by the National Security Agency at the highest security level, "A1," within two years. The theory was that the product would be so secure that an insurer would issue a bond guaranteeing the information the product was securing. Schell's plan referred to the fully evaluated and certified security product as "bondable." Schell also hoped to develop certain "pre-release products" within a period of 12 to 16 months. These products would not be certified, but could be sold to customers as part of the process of developing a certified product. He estimated that the project would require an initial investment of $5 million for the first year and $10 to 30 million for further development. Cannon said that he knew of individuals who would be willing to invest in the project. It was Schell's understanding that Cannon and his associates would supply the initial investment, and that the company would seek outside investment for further funding.

Cannon proposed using ESI as the corporate entity through which the project would be funded. Cannon described ESI as a corporate shell with no employees, no facilities and no chief executive. Although he described himself as a consultant to ESI, Cannon said that he would provide management leadership for the company until a chief executive could be found. He offered Schell the position of chief executive, but Schell declined because he preferred to focus on engineering, which he believed was the key to the success of the project. Cannon referred to a board of directors, but described it as a "temporary transitional board" and described the directors as place holders. Schell testified that it was his understanding that Cannon would be his boss if he was hired by ESI. Cannon did not disclose his criminal convictions or regulatory problems to Schell.

After this meeting, Schell forwarded to Cannon the resumes of Rich Lee and Gary

Baker. He also sent Cannon a description of the engineering objectives that needed to be met before the company could market any products. The most important requirement on this list was access to Novell and Gemini intellectual property, without which there could be no product development.

Schell testified that these engineering requirements were never met while he was with the company. The company entered into a teaming agreement with Gemini, pursuant to which ESI was authorized to distribute Gemini products under its own label. That agreement did not provide ESI with access to Gemini's source code. Further, under the teaming agreement all enhancements and developments of Gemini products would be owned exclusively by Gemini. ESI, through Cannon, was in the process of negotiating an acquisition of Gemini, but that transaction fell through after the Commission suspended trading of ESI stock.

Schell further testified that during his employment with ESI, no actual product development took place because the company never acquired access to the necessary Gemini and Novell intellectual property and never obtained the technical tools required to develop products. The company's only product to date, ESIGuard, is actually a 1995 Gemini product called GemGuard marketed under the ESI label. GemGuard was an adaptation of an earlier Gemini product. The earlier product had received A1 certification at the time, but the GemGuard product had never been evaluated. In Schell's opinion, neither GemGuard nor ESIGuard was a "bondable" product. Although certain potential customers, AIG Insurance and Market Data, had tested the product, they never purchased it, and no product was sold by ESI. Schell, who initially maintained the financial records of the company, testified

that he was told not to expect any revenue from the AIG and Market Data relationships.

Following his June 1999 meeting with Schell, Cannon met briefly with Lee and Baker. Shortly thereafter Cannon distributed proposed employment agreements to Schell, Lee and Baker. The terms of the employment agreements had been negotiated by Cannon and Schell at the June 1999 meeting. Schell, Lee and Baker accepted employment and began working for ESI in August 1999. Schell's title was executive vice president and head of engineering; Lee and Baker were vice presidents. They worked in an independent division of ESI called the Secure Systems Solutions division.

In August of 1999, Cannon contacted Solomon regarding the chief executive position with ESI. Solomon was recommended to Cannon by Jeffrey Moritz, treasurer and director of ESI at that time, with whom Solomon was acquainted. Cannon invited Solomon to New York and they met at the Waldorf Astoria Hotel in early September. At that meeting, Cannon identified himself as the senior management consultant to ESI and told Solomon that he had past problems that prohibited him from being an officer or director. Cannon then briefly described the business of ESI. Solomon, in turn, described his background, including the fact that his prior company, CEA, had gone into bankruptcy. He then stated his compensation terms: a three year contract, salary of $200,000 per year with the possibility of raises up to $500,000, stock in the company, profit sharing of up to 7% and a credit line of up to $750,000. Cannon approved of these terms and told Solomon that if the company did well, the board would not deny him anything. Following this meeting, Solomon had brief telephone conversations with Wayne Kight and Moritz. He

was then notified that he had been hired. Solomon rejected the first contract, which did not provide for the $750,000 line of credit. Shortly after, Kight sent him a new contract that contained the line of credit provision. That contract was executed on September 15, 1999.

When Solomon joined ESI, the company had $328 in revenue and assets of approximately $30,000. Solomon worked out of his residence in Massachusetts. Wayne Kight, who then held the position of vice president of operations and was in charge of the company's finances, operated out of Boca Raton, Florida. The engineering department, headed by Schell, was in Monterey, California. The Board of Directors consisted of Wayne Kight, Jeffrey Moritz and Nina Cannon Anthony, Cannon's daughter. Solomon testified that he was not aware that Anthony was Cannon's daughter until sometime later. The company had no source of revenue and paid salaries and expenses through the sale of stock and loans from stockholders. Company records at that time showed loans to ESI, arranged by Cannon, from Rowen House, HSC Consulting, Effingham, Ltd., all companies owned or controlled by Cannon, and Omega Funding, a company owned by Nina Cannon Anthony.

After Solomon was hired, he took several steps to demonstrate his authority. Schell testified that, in late September 1999, Solomon circulated a memorandum in which he stated that he was at the top of the chain of command. In December 1999, Solomon called an "all hands meeting," which Cannon attended. At the meeting, Solomon addressed the staff and reaffirmed that he was running the company, and Cannon agreed. On February 7, 2000, Solomon presented an organizational plan to the Board of Directors, which identified Solomon as the person to whom everyone was to report and did not include Cannon in the company hierarchy.

Notwithstanding the formal declarations that Solomon was in charge, the Commission presented substantial evidence that Cannon controlled the company. Milch testified that Cannon made it absolutely clear that he was the one running the company.[3] Cannon said that he could not be an officer or director of the company because of "SEC issues," and he agreed that he would be a "red flag" to investors. Instead, he put his daughter on the Board to look after his interest. Cannon further said to Milch that he had hired Solomon and understood that as the company grew he might have to replace him. In addition, Schell testified that, on three occasions, Cannon paid ESI's expenses with his own credit card. Solomon testified that he forwarded a draft of the Registration Statement to Cannon on at least one occasion. The Commission also presented an email from Solomon to an ESI attorney that contained Cannon's comments and suggestions for the Registration Statement. In addition, board minutes and corporate resolutions indicate that Cannon negotiated loans for the company, arranged for sales of stock to investors and negotiated the proposed acquisition of Gemini. When asked at his deposition whether he controlled ESI, Cannon invoked the Fifth Amendment privilege against self-incrimination.

Cannon's services as a consultant were terminated by ESI on March 20, 2000, ten days before the Commission suspended trading of ESI stock. This fact alone

---

**3.** According to Milch, Cannon also said that ESI would be "a good stock play," and therefore Milch's investment in the company could be profitable even if the company were not successful. The Milch testimony was received only with respect to Cannon. *See, supra,* note 2.

does not rebut the substantial evidence presented by the Commission that Cannon controlled ESI. Moreover, there is contradictory evidence as to the reason for Cannon's termination. The minutes of the March 20, 2000 Special Meeting of the ESI Board, at which the Board terminated Cannon, state that the consulting agreements with HSC Consulting were terminated "due to personal time constraints of HSC Consulting." But Solomon testified that he fired Cannon because Cannon failed to meet certain objectives for which he was retained and that the board minutes were falsified at the request of Nina Cannon to protect her father's reputation.

**The Alleged Violations**

As of September 1999, ESI was listed on the National Association of Securities Dealers ("NASD") Over–The–Counter bulletin board ("OTC bulletin board") under the symbol EPSO. According to the monthly statements of the Gibraltar entities at Colin Winthrop and Wall Street Equities, ESI was trading at approximately $6 to $7 per share in September 1999.

At about this time, the NASD instituted a rule that companies whose stock was traded on the bulletin board were required to file audited financial statements. The NASD selected stocks alphabetically, and gave the selected companies 30 days to make the required filings. The NASD indicated on the bulletin board that a company was selected and had 30 days to file by placing an "E" after the stock symbol. If a company failed to comply it would be de-listed from the bulletin board, and shares of that company's stock could only be traded in the "pink sheets." Prices of stocks in the pink sheets are not quoted to the public. Consequently, shares of de-listed stock are more difficult to sell.

In October 1999, Salvatore Cerruto, a broker at Wall Street Equities who han-

dled the accounts of the Gibraltar entities, contacted Cannon and warned him that if ESI did not submit its audited financial statements, it would be de-listed. Cannon told Cerruto that ESI's accountants had everything ready and were prepared to file with the NASD.

In early November 1999, ESI was de-listed from the OTC bulletin board. On November 18, ESI filed a Form 10–SB Registration Statement with the Commission in connection with its application to the NASD to be re-listed. The preparation of that document by the law firm of Bondy & Schloss, ESI's attorneys, had begun prior to Solomon's employment with the company. Solomon filled out a questionnaire, given to him by ESI's attorneys, that contained information about his business background, including business and personal bankruptcies. He reviewed drafts of the Registration Statement and suggested changes. Solomon signed the Registration Statement on behalf of the company. Cannon also reviewed a draft of the Registration Statement and suggested changes to it on at least one occasion. The Registration Statement did not describe Cannon as either a promoter or control person of ESI. It contained no mention of Cannon. The Registration Statement described Solomon's management experience with CEA, but did not disclose that CEA had gone into bankruptcy.

Schell testified that toward the end of 1999, ESI's development activities were redirected. He received a revised business plan, approved by the board of directors, that focused more on the short term sale of ESIGuard and less on the longer term development of products that Schell had envisioned. While discussing the new business plan, Solomon told Schell that the old business plan was not "sellable" to investors. The change of direction created tension between Schell and Solo-

mon. Roughly a month after Solomon joined ESI, Schell was asked to give a presentation on the nature of ESI's business to AIG. Shortly before the presentation, Schell and Solomon had what Schell characterized as an "animated discussion" about the content of the presentation. Schell said that he was trying to be technically accurate with respect to GemGuard, but Solomon told him that he needed to be more aggressive in presenting GemGuard as a product that could serve AIG's security needs. On other occasions, Solomon pressured Schell to tell possible customers and investors that GemGuard was a "high assurance" or "bondable" product, but Schell was unwilling to make such statements because he believed that they were untrue.

In January 2000, during the period in which ESI was de-listed from the OTC bulletin board, its stock price fell to as low as $2 per share. It was re-listed sometime in February and began trading at approximately $6 to $7 again. On February 24, 2000, shortly after being re-listed, ESI entered into an agreement with Global Financial Group, Inc., a Minneapolis-based brokerage firm, pursuant to which ESI engaged Global to be its non-exclusive investment banker. For the first 30 days following its re-listing, Global Financial Group was the only broker authorized to sell ESI stock on the OTC bulletin board. By mid-March, however, other firms had entered the market and were selling ESI stock.

On March 14, ESI issued a press release announcing that "the first of its bondable products, ESIGuard, is scheduled for release in April 2000." Solomon testified that he believed, based on discussions with insurance companies, that ESIGuard was bondable. Schell, who wrote the engineering plan which first used the term, testified that ESIGuard was not bondable. I find that the description of ESIGuard as "bondable" was false. Schell also testified that the term "bondable" does not have a precise definition in the industry, and was largely invented by him in the engineering plan. The March 14 press release also used the phrases "high assurance," "high integrity" and "strong assurance" to describe the security properties of ESIGuard. Based on Schell's testimony, I find that these descriptions overstated the level of security ESIGuard would provide. Schell testified that ESIGuard was not certified and rated by the federal government, and without government certification there was no reason to believe that the product would be secure. He also testified that within the company "there had been substantial discussion about the security properties or lack thereof of the GEM-Guard."

On March 28, ESI issued another press release announcing that "its Internet and Data Transfer Security Products have been granted Export approval by the U.S. Government." ESI did not apply for export approval for ESIGuard, ESI's only product. Gemini, however, obtained export approval for GemGuard.

At about this time, Solomon arranged for an ESI web site to be posted on the Internet. In the "About Us" portion of the web site, the company made the following representations:

Enterprise Solutions Inc. developed a suite of products and solutions for Internet security along with great network support—a combination that can't be beat!

Through our commitment, experience, and expertise Enterprise Solutions Inc. has established a business relationship with our customers that will last a lifetime!

Solomon testified that he did not prepare the content of the site, but he did review it.

He admitted that ESI had not, in fact, developed a suite of products. He testified that certain products were under development, and the web site representation was an inadvertent mistake. Solomon also admitted that the company had not sold any products. Schell testified that he discussed the website with Solomon and raised his concern that it overstated the degree of development the company had achieved. Solomon asked Schell to put his concerns in writing, and Schell did so.

During late March, ESI's stock price rose sharply, with a high of $23 per share.[4] On March 30, the Commission issued an order suspending the trading of ESI stock.

## DISCUSSION

 To prove a violation of § 10(b) and Rule 10b–5, the Commission must prove by a preponderance of the credible evidence that, in connection with the purchase or sale of any security, defendants, acting with scienter, employed a device, scheme, or artifice to defraud, or made an untrue statement of a material fact or omitted to state a material fact in order to make the statements made, in light of the circumstances under which they were made, not misleading. *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1467 (2d Cir.1996); 17 C.F.R. § 240.10b–5. Scienter, in the 10b–5 context, may be established by showing an intent to deceive, knowing misconduct, *First Jersey*, 101 F.3d at 1467, or reckless disregard for the truth. *S.E.C. v. McNulty*, 137 F.3d 732, 741 (2d Cir.1998); *see generally Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Recklessness is demonstrated by "conduct

which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *McNulty*, 137 F.3d at 741 (internal quotations omitted).

## The Registration Statement

Failure to Disclose Cannon's Role in ESI

A. Materiality

 To establish that defendants' failure to disclose Cannon's involvement with the company was a violation of 10b–5, the Commission must prove by a preponderance of the credible evidence that the omission was misleading as to a material fact. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). In assessing the materiality of an omission, a court must determine "if there is a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259, 267–68 (2d Cir.1993) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Given Cannon's extensive history of criminal and regulatory violations, disclosure of his significant participation in the company would certainly have altered the "total mix" of information available to a reasonable shareholder.

 In addition, disclosure of Cannon's involvement with ESI was required by SEC Regulation S–B, which sets forth the disclosure requirements for registration statements. Item 401 of Regulation S–B

---

4. Skidell, a broker at Colin Winthrop, testified that there was a general increase in the price of technology stocks during February and March of 2000. Defendants argue that the price increase occurred as a result of the general market trend. It is undisputed, how-

ever, that the significant increase in the market price of ESI stock occurred in mid to late March, at the same time that ESI stock began being sold freely on the bulletin board, and ESI published the press releases and posted its web site.

requires that an issuer list the names of all directors, executive officers and significant employees of the company and provide a brief description of the business experience of each one. 17 C.F.R. § 228.401(a),(b). Directors and executive officers are broadly defined by the Exchange Act and the Commission to include not only those formally designated as such, but also any person who performs a similar role for the company. *See* 15 U.S.C. § 78c(a)(3)(B)(7); 17 C.F.R. § 240.3b–7. Item 404 of Regulation S–B requires that an issuer disclose the name of all promoters and describe all transactions between promoters and the company. 17 C.F.R. § 228.404(d). A promoter, as defined by SEC Regulation 12B, means "[a]ny person who, acting alone or in conjunction with one or more other persons, directly or indirectly takes initiative in founding and organizing the business or enterprise of an issuer." 17 C.F.R. § 240.12b–2.

A company cannot lawfully hide a significant figure in the management of the company behind the vague title "consultant." Cannon's activities on behalf of the ESI at the time it filed the Registration Statement were sufficiently similar to the duties of an officer or director of the company that his involvement, along with his history of criminal and regulatory violations, ought to have been disclosed. The evidence adduced at trial demonstrates that he was also a promoter.

Finally, Item 403 of Regulation S–B requires that an issuer disclose all beneficial owners of more than 5% of the company's common stock. 17 C.F.R. § 228.403. The Instructions to that Item define the term "beneficial owner" to include any person who has or shares "[i]nvestment power, which includes the power to dispose, or to direct the disposition of, such security." *Id.*, Instruction 4(a)(2) to Item 403. It is undisputed that Cannon had investment authority over the accounts at Colin Winthrop and Wall Street Equities for the Gibraltar entities, including Humphrey and Rowen House, each of which owned more than 5% of ESI's common stock at the time the Registration Statement was filed. In addition, the Commission proved by a preponderance of the credible evidence that Cannon had an ownership interest in the Gibraltar entities.

## B. Scienter

■ Cannon and Solomon acted with scienter by knowingly and intentionally concealing Cannon's role in the company. Cannon was aware that his past regulatory and criminal violations, if known to public investors, would adversely affect the ability of the company to obtain capital. Cannon formally designated himself a consultant so that he could participate in the management of ESI without disclosing his participation to the public or to the Commission, which had banned him from the securities industry in 1987. He also attempted to conceal the extent of his equity interest in ESI by buying the majority of his shares through the Gibraltar entities. Solomon knowingly participated in the deception. Cannon told Solomon at their first meeting that he had past problems, which Solomon understood to be of a criminal nature, that precluded him from serving as an officer or director. The Commission did not prove that Solomon knew the full extent of Cannon's role in the organization of ESI, including his ownership of a controlling interest in the company through the Gibraltar entities. Nevertheless, the evidence shows that Solomon knew that Cannon was bringing in private investors, arranging loans, negotiating with Gemini, and participating in the preparation of the Registration Statement. Solomon also knew that Cannon had interviewed him and negotiated his contract on behalf of ESI.

## C. Personal Liability

■ Solomon and Cannon are liable as both primary violators and control persons of ESI for failing to disclose Cannon's involvement. To establish primary liability, the Commission must prove that each defendant (1) made material misrepresentations or omissions or employed a manipulative device or (2) "participated in the fraudulent scheme." *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1471 (2d Cir.1996); *S.E.C. v. U.S. Environmental, Inc.*, 155 F.3d 107, 111 (2d Cir.1998).

Solomon participated in the preparation of the Registration Statement and signed it on behalf of the company. *See In re JWP Inc. Securities Litigation*, 928 F.Supp. 1239, 1255–56 (S.D.N.Y.1996) (defendants primarily liable for misstatements in 10–K that they signed). Although Cannon did not personally make the misleading statements in the Registration Statement, he participated in its preparation by reviewing a draft and suggesting comments. More importantly, Cannon organized ESI and is responsible for structuring the deceptive "consulting" relationship between himself and the company. As such, he was the principal architect of the fraudulent scheme. *See First Jersey*, 101 F.3d at 1471–72 (upholding primary liability of the principal of brokerage firm who orchestrated firm's practice of fraudulently selling securities at excessive markups).

■ Defendants are also liable as control persons under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). In order to establish a prima facie case of control person liability, the Commission must show (1) a primary violation by ESI, (2) control of ESI by the defendants, and (3) that the defendants were culpable participants in the fraud perpetrated by ESI. *First Jersey*, 101 F.3d at 1472. Control over a primary violator may be established by showing that the defendant possessed

"the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2. As discussed above, ESI's failure to disclose Cannon's involvement was a primary violation of 10(b).

Solomon, as chief executive of ESI, had control authority over ESI. He reviewed the Registration Statement, knew that it was misleading and nevertheless signed it on behalf of the company. He was therefore a culpable participant in the deception.

The Commission has proven that Cannon had actual control as well as the power to direct the actions of ESI through the ownership of voting securities at the time the Registration Statement was filed. *See* 17 C.F.R. § 240.12b–2. Cannon participated in the preparation of the Registration Statement, knew that it was misleading and was therefore also a culpable participant in the deception.

■ Once a plaintiff makes out a prima facie case of § 20(a) liability, the burden shifts to the defendant to show that he acted in good faith and that he did not directly or indirectly induce the act or acts constituting the violation. *First Jersey*, 101 F.3d at 1473; *see also* 15 U.S.C. § 78t. To meet this burden, defendants "must prove that [they] exercised due care in [their] supervision of the violator's activities" through "a reasonable and proper system of supervision and controls." *First Jersey*, 101 F.3d at 1473 (quoting *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir.1980)). Plaintiffs have failed to make the requisite showing of good faith.

### The Bankruptcy of Solomon's Former Company

■ The Registration Statement also failed to disclose that CEA, Inc. went into

bankruptcy in 1995, while Solomon was its CEO. Solomon concedes that the information was material and should have been disclosed, but argues that the omission, while negligent, was not intentionally misleading. Solomon argues that he disclosed the information to ESI's attorneys and relied on them in good faith to include in the Registration Statement anything that was required to be disclosed.

■■■■■ Good faith reliance on advice of counsel by a criminal defendant may rebut a showing of criminal intent. *See United States v. Evangelista,* 122 F.3d 112, 117 (2d Cir.1997). But in the context of a civil securities action, reliance on advice of counsel "is not a complete defense, but only one factor for consideration." *Markowski v. S.E.C.,* 34 F.3d 99, 105 (2d Cir.1994); *see S.E.C. v. Savoy Indus., Inc.,* 665 F.2d 1310, 1315 n. 28 (D.C.Cir.1981). To invoke this principle, a defendant must show that he (1) made complete disclosure to counsel, (2) sought advice as to the legality of his conduct, (3) received advice that his conduct was legal, and (4) relied on that advice in good faith. *Markowski,* 34 F.3d at 105. Solomon included information about the bankruptcy, along with a lot of other information, in the questionnaire responses he provided to counsel. But he never sought specific advice from counsel with respect to disclosure of the bankruptcy, nor did he receive specific advice that ESI was not required to disclose the bankruptcy. Good faith reliance on the advice of counsel means more than simply supplying counsel with information. Corporate executives have an independent duty to insure that proper disclosures are made. "Compliance with federal securities laws cannot be avoided by simply retaining outside counsel to prepare required documents." *Savoy Indus.,* 665 F.2d at 1315 n. 28.

Solomon's failure to insure that CEA's bankruptcy was disclosed demonstrates reckless disregard for the truth, satisfying the scienter requirement. Cannon, whom Solomon informed of the bankruptcy at their initial meeting, was also reckless in failing to see to it that the bankruptcy was disclosed in the Registration Statement. For the reasons discussed above, defendants are personally liable for the omission as both primary violators and control persons.

## The Press Releases and the Website

### The Press Releases

The Commission alleges that the March 14 press release misleadingly portrayed ESIGuard as a product developed by ESI, when, in fact, it was an old product designed by Gemini. It also alleges that the press release overstated the security properties of ESIGuard by describing it as "bondable."

■■■■ With respect to the first allegation, the press release was not materially misleading. It did not represent that ESI, itself, designed or developed ESIGuard. It said only that the product was ready for release in April 2000. ESI had a teaming agreement with Gemini, pursuant to which it could market the product as an "original equipment manufacturer" or OEM. Schell testified that it was a common practice in the software industry for a company to market a product under its own label as an OEM even though it did not manufacture the product or did not manufacture all the components of the product. The Commission proffered no evidence to rebut Schell's testimony.

■■■■ However, the press release was materially misleading with respect to the security properties of ESIGuard. It falsely described ESIGuard as a "bondable product," and used other phrases like "high integrity," "high assurance" and

"strong assurance" to describe its security properties. Schell credibly testified that ESIGuard was not bondable. The term, while not precisely defined in the industry, conveys a general sense of the security properties of the product. The use of the term in the press release, in combination with the other descriptive phrases, suggests that ESIGuard is a saleable security product. Given Schell's testimony about the security properties of ESIGuard, and the fact that no product was ever sold, ESI had no basis for representing ESIGuard as a saleable product.

■ The Commission alleges that the March 28 press release, which announced that ESI had received federal approval to export ESIGuard, was materially misleading because ESI, itself, had never applied for or received export approval.

The export of computer products that contain encryption technology is governed by the Export Administration Regulations ("EAR"). 15 C.F.R. § 740.17; *see generally* 15 C.F.R. chapter VII, subchapter C. Items subject to the EAR may only be exported under a license granted by the Bureau of Export Administration ("BXA") or under one of several license exceptions. 15 C.F.R. § 730.6, § 740.1. Specific encryption products must be submitted to the BXA to determine whether the license exception for encryption commodities and software applies. 15 C.F.R. § 740.17(c). It is undisputed Gemini received export approval for GemGuard. Export approval under the encryption license exception is granted by the BXA for specific encryption products, and appears to cover distribution and resale by entities other than the manufacturer. *See* 15 C.F.R. § 740.17. ESI could therefore export the product pursuant to the approval obtained by Gemini. Whether it was Gemini or ESI that actually received the approval is not material. What matters to investors is that ESI had

the ability to export its product. With respect to that issue, the press release was accurate.

### The ESI Website

■ The Commission alleges that the ESI website falsely represented that ESI (1) "developed a suite of products" and (2) "established business relationships with customers that will last a lifetime."

Both statements were materially false and misleading. ESI had not developed any products. In fact, it had not engaged in any product development at all. Whether the company actually had products to sell is clearly relevant information to a potential investor.

The second statement is also misleading. At the time ESI posted the website, it had not sold any products and it had no customers. Two companies, AIG Insurance and Market Data, were in possession of the GemGuard product, purportedly for testing, but there was no reason to expect that they were going to purchase it. When read together, these statements give the misleading impression that ESI was a fully developed company with an actual source of revenue. In reality, the company had no revenue and its limited operations were funded solely by sales of stock and loans from investors.

The misstatements of material fact in the March 14 press release and on the website were made with scienter. The Commission proved that Solomon knew that the statements in question were false and misleading, and knowingly allowed the misstatements to be published. As discussed above, scienter in the 10(b) context includes knowing misconduct. *First Jersey*, 101 F.3d at 1467. Schell's testimony demonstrates that Solomon was aware that ESIGuard would not provide the high degree of security represented by the March 14 press release. His testimony also

shows that, on other occasions, Solomon pressured Schell to be "aggressive" in promoting ESIGuard and to make false representations about its security properties. Further, Solomon's claim that the website inadvertently misstated ESI's product development is contradicted by Schell's testimony that he raised that very issue with Solomon when the website was first posted.

The Commission established a prima facie case of control person liability against Solomon and Cannon. As discussed above, the Commission has proven that both Solomon and Cannon had the ability to direct the actions of the company. The Commission also proffered evidence that Solomon played an active part in directing the marketing efforts of ESI, which included making unwarranted representations to investors. He was therefore a culpable participant in the violation. The Commission did not proffer any evidence that Cannon actively participated in drafting the press releases or the website. However, Cannon was asked at his deposition about the extent of his involvement with the website, and he invoked the Fifth Amendment privilege against self-incrimination. Moreover, the Commission proved that Cannon controlled the company and owned a large number of shares of ESI stock. He had both the ability to influence ESI's disclosures and a direct financial interest in increasing the market value of ESI shares. Therefore, he was also a culpable participant in the violation. Neither defendant made the requisite showing of good faith to defeat the Commission's prima facie case.

**Remedies**

The Commission seeks injunctive relief and imposition of statutory penalties against Cannon and Solomon, as well as an order of disgorgement against Cannon.

### Disgorgement of Cannon's Profits

"In the exercise of its equity powers, a district court may order the disgorgement of profits acquired through securities fraud." *S.E.C. v. Patel*, 61 F.3d 137, 139 (2d Cir.1995). Through the Gibraltar entities, Cannon sold hundreds of thousands of shares of ESI stock in March of 2000 before the Commission suspended trading of the stock. On March 30 and 31, Cannon's Montville account with Wall Street Equities was credited with over $2.2 million as proceeds of the sale of 152,000 shares of ESI stock. The evidence does not allow for an exact calculation of Cannon's profits. However, the amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation," *Patel*, 61 F.3d at 139. The average purchase price of the shares in the Rowen House and Montville accounts for which there is evidence of a purchase price is $7.79 per share. Assuming a comparable purchase price for the ESI shares sold by Cannon in late March 2000, I find that Cannon's profits from the sale of ESI stock were at least $1 million. Accordingly, I order Cannon to disgorge $1 million.

### Injunctive Relief

A permanent injunction prohibiting defendants from committing further violations is appropriate where "there is a likelihood that, unless enjoined, the violations will continue." *First Jersey*, 101 F.3d at 1477 (quoting *Commodity Futures Trading Commission v. American Board of Trade, Inc.*, 803 F.2d 1242, 1250–51 (2d Cir.1986)). The Second Circuit has identified several considerations that warrant imposition of injunctive relief, including a history of past violations, whether the present violation was "founded on systematic wrongdoing, rather than an isolated occurrence," the degree of culpability of

defendants, and whether defendants have admitted wrongdoing. *Id.* (quoting *United States v. Carson,* 52 F.3d 1173, 1184 (2d Cir.1995)).

After consideration of these factors, I permanently enjoin defendant Cannon from further violating the securities laws in connection with ESI. Cannon has an extensive history of criminal and regulatory violations, including securities fraud. He was the principal architect of the scheme to conceal his involvement with ESI. Further, Cannon still has the ability to affect the activities of ESI through his ownership interest in the Gibraltar entities, which continue to own hundreds of thousands of shares of ESI stock. Pursuant to the October 12, 2000, Consent Judgment, ESI disclosed Cannon's role as a promoter in subsequent SEC filings, but Cannon continues to deny any ownership interest in the Gibraltar entities. These circumstances suggest a substantial likelihood of further violations and warrant injunctive relief.

Solomon has no history of criminal violations, fraud or other misconduct and this is his first experience running a public company. The Commission has not demonstrated that Solomon is likely to commit further violations. Accordingly, a permanent injunction against Solomon is not warranted.

### Statutory Penalties

The Securities Enforcement Remedies and Penny Stock Reform Act of 1990 (the "Remedies Act"), 15 U.S.C. § 78u(d)(3), prescribes three tiers of penalties for violations of the securities laws. The second tier provides for a maximum penalty of $50,000, if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 78u(d)(3)(B)(ii). The third tier provides for a maximum of $100,000, if, in addition, the violation "di-rectly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.,* § 78u(d)(3)(B)(iii).

The Commission has established that defendants' 10(b) violations involved fraud and deceit, and, as to Cannon, that his violations resulted in substantial losses to other persons. Second tier statutory penalties are warranted against Solomon, and third tier against Cannon. Accordingly, Cannon is directed to pay a statutory penalty of $100,000, and Solomon is directed to pay a statutory penalty of $10,000.

### CONCLUSION

The foregoing shall constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). The Clerk of the Court shall enter judgment in favor of the Commission and against defendants John Solomon and Herbert Cannon. Cannon is permanently enjoined from committing further violations of the securities laws in connection with ESI, and is ordered to disgorge $1,000,000 in illicit profits and to pay a statutory penalty of $100,000. Solomon is ordered to pay a statutory penalty of $10,000.