[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 26, 2011
JOHN LEY
CLERK

_____

No. 10-10548

_____

D.C. Docket No. 6:08-cv-02120-ACC-GJK

BABY ROBERTA SOLIS BAMERT,
JERRY CRAFT,
JESSICA CRAFT,
JOSEPH DENOIA.
RICHARD FAKADEJ,
KIMBERLY FAKADEJ,
JANOS FARKAS,
THE VISTA TRUST,
THE ISLE TRUST,
WINIFRED FIELDS,
DENNIS FONG,
YVONNE FONG,
KEN HONG,
MEGAN SO MING HUI,
MUK SUM HUI,
RICHARD JASIN,
AIMEE OCHOTORENA,
FRANK PADILLA,
MARY PADILLA,
MARILOU PULMANO,
DARMANDRA RAMDOWE,
TEJMATTEE RAMDOWE,
KRISHNADAT RAMDOWE,
GANMATTEE RAMDOWE,
BARBARA REID,
STEPHEN REID,

DONALD SCRIMGEOUR,
FRANK SCURTI,
THOMAS SCURTI,
PERUVEMBRA SUNDARESAN,
GLORIA SUNDARESAN,
CHERYL TAMADA,
FRANK TAMADA,
DANIEL TRAN,
TOM TRAN,
MICHAEL D. GRAVES,
KINGDON INVESTMENTS OF BRANDON, LLC,

Plaintiffs - Appellants,

versus

PULTE HOME CORPORATION,
a Michigan Corporation,
THE WEAR GROUP, INC.,
JAMES E. WEAR,
OSCEOLA MANAGEMENT & CONSULTING, INC.,
JAMES J. MURPHY,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 26, 2011)

2

Before EDMONDSON and MARTIN, Circuit Judges, and HODGES,[*] District Judge.

PER CURIAM:

Plaintiffs each purchased at least one condominium unit from Defendant Pulte Home Corporation ("Pulte"), and entered into a separate management agreement with Defendant Osceola Management & Consulting, Inc. ("OMC") for the short-term rental of those units.  Plaintiffs later brought this suit alleging violations of federal securities law arising from and related to these transactions.  The District Court dismissed these claims because the transactions at issue were not "investment contract[s]" subject to federal securities law.  Plaintiffs now appeal that ruling.  After careful review of the record and the parties' briefs, and with the benefit of oral argument, we reverse the District Court's dismissal of Plaintiffs' claims against Pulte, The Wear Group, James E. Wear[1], OMC, and James J. Murphy.  We remand the case to the District Court for further proceedings consistent with this opinion.

I.

---

[*] Honorable William Terrell Hodges, United States District Judge for the Middle District of Florida, sitting by designation.

[1] On December 3, 2010 this Court was notified of the Voluntary Petition of Bankruptcy filed by James E. Wear, which filing operates as a stay of this action against him.  Thus, while we mention Wear in setting forth the background of this case, this Order neither takes nor furthers any action against him.

Plaintiffs purchased condominium units in two connected developments in Orlando, Florida. The developments—Vista Cay at Harbor Square and The Isles at Cay Commons—were newly constructed by Pulte. Each plaintiff purchased one and in some cases two condominiums from Pulte. Plaintiffs contend that they were not merely condominium purchasers, but instead were investors in a program in which the units could be rented on a short-term basis. They assert that The Wear Group and James E. Wear acted as real estate agents in connection with the transactions, and that OMC and one of its officers, James J. Murphy, provided management services and functioned "as exclusive rental agent that would maintain, manage and rent the units at premium rental rates."

More specifically, Plaintiffs allege in their amended complaint, that The Wear Group's website contained a promotional statement, under the headline "TWG joins with Fortune 150 builder Pulte Home for Vista Cay," which read:

> The Wear Group announced a joint venture with Pulte Homes for Vista Cay, a resort development located in Orlando, Florida, directly adjacent to the 2nd largest convention center in the U.S. "We are proud to team up with Wear Group Realty, their reputation is outstanding" said a Pulte Representative. Demand in the area is so strong that a well known

4

property management company has offered all investors guaranteed mortgage, tax and HOA payments up to 5 years.[2]

Plaintiffs also assert that The Wear Group distributed promotional materials that emphasized "effortless" ownership of the properties. In the amended complaint, Plaintiffs state that

> [a]s part of the investment contract offering, investors were promised incentives that would allow them to purchase units in Vista Cay and The Isles "risk free." These incentives promised to pay all the costs of owning the condominium units, including mortgage payments, condominium association dues, taxes, utilities, insurance, furnishings, and other expenses of owning the units. The defendants guaranteed these incentives would be fully paid for a period of 24 months with an option to renew for up to five years.

Under this program, all bills related to ownership of the property would be paid by OMC out of rents, which were guaranteed to cover these costs, for a period of 24 months. Any rental profits above the costs of ownership would be enjoyed by OMC, while Plaintiffs would benefit from any appreciation to the value of the property during that time. To qualify for this program, the purchasers would have to use Pulte's "preferred lender and loan program," because this ensured that mortgage payments would be low enough to accommodate the guaranteed offer.

---

[2] Plaintiffs contend that OMC was the "well known property management company" referenced in the article.

Plaintiffs' purchase agreements with Pulte, and the various addenda to those agreements, expressly stated that the transaction was limited to the terms of the agreements and did not include any promotional representations outside of the agreement. First, the purchase agreements state in bold, capitalized letters at the very top of the document:

> ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER, FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY FLORIDA STATUTES SECTION 718.503, TO BE FURNISHED BY DEVELOPER TO A BUYER OR LESSEE.[3]

Each agreement specifies a particular unit, includes an escrow clause identifying an escrow agent, and provides an anticipated closing date for transfer of physical possession of the unit. The agreements also include an "Entire Agreement" clause, which states:

> This is the complete Agreement between Buyer and Seller concerning the purchase of the Unit. Any prior agreements, written or oral, are superseded by the Agreement. Buyer acknowledges that it is not relying upon any promises, agreements or representations made by Seller, Seller's salespersons, agents, subcontractors or other employees ("Seller's Representatives") concerning the Unit or any land adjacent to or near the Unit, except as set forth in this Agreement and the

---

[3] The purchase agreements are materially similar. The references in this opinion are to, and the quotations are from, the purchase agreement for the first named plaintiff, Baby Roberta Solis Bamert.

6

Prospectus and all its exhibits filed with the Division of Florida Land Sales, Condominiums and Mobile Homes. Buyer also acknowledges that none of Seller's Representatives (other than Seller's Authorized Agent who has accepted this Agreement) has the authority to modify this Agreement or to make any oral promise, agreement or representation inconsistent or contrary to the terms of this Agreement. This Agreement may be changed only by a written document signed by both Buyer and Seller's Authorized Agent. The invalidity or unenforceability of any particular provision of this Agreement will not affect the other provisions and the Agreement will be interpreted in all respects as if such unenforceable provisions were omitted.

The contract also provides that:

Buyer acknowledges[,] warrants, represents and agrees that this Agreement is being entered into by Buyer without reliance upon any representations concerning any potential for future profit, any rental income potential, tax advantages, depreciation, appreciation or investment potential and without reliance upon any other monetary or financial advantage. Buyer acknowledges and agrees that no such representations, including representations as to the ability or willingness of Seller or its affiliates to assist Buyer in renting or selling the Unit, have been made by Seller, or any of its agents, employees or representatives. This Agreement contains the entire understanding between Buyer and Seller, and Buyer hereby acknowledges that the displays, architectural models, artist renderings and other promotional materials contained in the sales office and model units are for promotional purposes only and may not be relied upon. All descriptions of the locations, areas, capacities, and sizes of units and other facilities are approximations only and are based upon architectural measurements. Buyer warrants that Buyer has not relied upon any verbal representations, advertising, portrayals or promises other than as expressly contained herein and in the Condominium documents, including specifically, but without limitation, any representations as to: (a) potential appreciation in or resale value of the Unit, (b) the existence of any "view" from the Unit or that any existing "view" will not be obstructed in the future, (c) traffic conditions in, near or around the

Condominium, (d) disturbance from nearby properties, (e) disturbance from air or vehicular traffic, or (f) any future use of adjacent properties. The provisions of this paragraph shall survive the Closing.

The contracts also included several addenda. The addendum entitled "Pulte Rewards Program - Preferred Lender" states "the choice of lender is Your sole decision and You are not obligated to use our preferred lender or to elect the PULTE REWARDS PROGRAM." The "First Addendum to Contract for Purchase and Sale" provides that "Buyer will not transfer its rights under the Contract nor enter into any agreement for the sale or other transfer of the Unit that would prevent Buyer from holding fee simple title interest in the Unit, from and after the date of Closing for a period of at least one (1) year (the 'Holding Period')." Another addendum provides that "[m]aintenance of the individual units (interior) will be the responsibility of the unit owner."

Finally, the "Short Term Rental" addendum provides:

YOU ARE HEREBY ADVISED THAT THE Isle at Cay Commons - Ventura 4/40 Condos COMMUNITY IS PERMITTED TO CONTAIN AND DOES CONTAIN HOMES THAT ARE MARKETED, SOLD, AND RESOLD TO INDIVIDUALS AND GROUPS THAT RENT OR LEASE SUCH HOMES ON A SHORT TERM BASIS.

The undersigned acknowledge[s] that neither Pulte Homes nor its employees, agents, sales staff, or any other party has induced the undersigned to enter into this Agreement with any promises of economic benefits available from renting the Condominium Unit or Dwelling after the undersigned's purchase of the Condominium Unit or Dwelling.

8

The undersigned understands and acknowledges that they are under no obligation to participate in or enter into any rental pool agreement, which might be available.

The undersigned hereby acknowledge[s] that they understand the potential impacts on the Isle at Cay Commons - Ventura 4/40 Condos Community resulting from such short-term rentals.

The undersigned hereby acknowledges that Pulte Homes has advised them, and they understand that Pulte Homes is not affiliated with any real estate brokers or managerial companies involved with short term rental programs in the Isle at Cay Commons - Ventura 4/40 Condos Community.

THE UNDERSIGNED ACKNOWLEDGES THAT THEY UNDERSTAND THAT PULTE HOMES ASSUMES NO LIABILITY TO THE UNDERSIGNED OR THEIR SUCCESSORS OR ASSIGNS IN CONNECTION WITH THE SHORT TERM RENTALS IN THE Isle at Cay Commons - Ventura 4/40 Condos COMMUNITY, AND HEREBY RELEASE AND DISCHARGE PULTE HOMES FROM ANY AND ALL LIABILITY ARISING FROM SUCH SHORT TERM RENTALS.

Prior to closing, each plaintiff contracted with OMC to rent, operate, and manage their units. Plaintiffs allege, contrary to the express language in the purchase agreements, that "OMC was the exclusive rental agent for the units, which meant that the investors had no control of the rental of the units or the operation of Vista Cay and The Isles." Plaintiffs allege that in June 2008, OMC breached the rental agreements and refused to honor its guarantee to pay all of Plaintiffs' carrying costs.

9

II.

In their amended complaint, Plaintiffs allege that the defendants sold them "investment contracts" in violation of federal securities law, and seek to rescind their contracts and recover damages. Specifically, Plaintiffs allege against all defendants: (1) sale of unregistered securities (federal), in violation of 15 U.S.C. §§ 77e(a) and (b); (2) sale of securities by unlicensed persons (federal), in violation of 15 U.S.C. § 77o; (3) securities fraud (federal), in violation of 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; (4) sale of unregistered securities (state), in violation of Fla. Stat. § 517.211; (5) sale of securities by unregistered persons (state), in violation of Fla. Stat. § 517.211; (6) securities fraud (state), in violation of Fla. Stat. § 517.301; (7) fraud and fraud in the inducement; and (8) negligent misrepresentation. Plaintiffs also allege (9) breach of contract against OMC and Mr. Murphy, and (10) unfair or deceptive acts against Pulte, in violation of Fla. Stat. § 501.201 et. seq., and seek (11) declaratory judgment against Pulte for deceptive and unfair trade practices under Fla. Stat. § 501.211.

Pulte moved to dismiss the amended complaint. It argued that federal securities law did not apply because there was no sale of securities (and therefore

the court could not exercise supplemental jurisdiction over the state-law claims).[4]

OMC and Mr. Murphy next moved to dismiss the amended complaint, incorporating Pulte's arguments and providing a supplemental memorandum. The Wear Group and Mr. Wear also filed a motion to dismiss, and likewise adopted the arguments of Pulte, OMC and Mr. Murphy.[5] The District Court granted the defendants' motions to dismiss, upon concluding that the transaction was not an investment contract, and therefore federal securities law did not apply. The court declined to exercise supplemental jurisdiction over the remaining state-law claims under 28 U.S.C. § 1367(c)(3),[6] and entered final judgment in favor of the defendants. Plaintiffs now appeal that judgment.

## III.

This Court reviews de novo the District Court's dismissal of Plaintiffs' amended complaint under Federal Rule of Civil Procedure 12(b)(6). Berman v.

---

[4] Alternatively, Pulte argued: (1) that the sale of unregistered securities (federal) claim was time barred; (2) that there was no private right of action for a violation of 15 U.S.C. § 77o; (3) that the 10b-5 securities fraud claims were time-barred and failed to meet the heightened pleading standard for fraud under Federal Rule of Civil Procedure 9(b); and (4) that the state-law claims failed on the merits as well.

[5] The Wear Group and Mr. Wear argued in addition that Plaintiffs had sued the wrong entity, noting that the article identified by the Plaintiffs in their complaint referred to Wear Group Realty, an entity distinct from The Wear Group.

[6] The District Court did not reach or discuss any of the alternate grounds for dismissal advanced by the defendants.

11

Blount Parrish & Co., Inc., 525 F.3d 1057, 1058 (11th Cir. 2008). The Supreme

Court has explained that

> a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Ashcroft v. Iqbal, --- U.S. ---, 129 S. Ct. 1937, 1950 (2009).

Plaintiffs argue that the District Court erred in its conclusion that the

transactions at issue in this case were not "investment contracts" subject to federal

securities laws. Under both the Securities Act of 1933 and the Securities

Exchange Act of 1934, Congress defined the term "security" to include an

"investment contract." SEC v. Edwards. 540 U.S. 389, 393, 124 S. Ct. 892, 896

(2004); see also 15 U.S.C. § 77b(a)(1) ("The term 'security' means any . . .

investment contract . . . ."); 15 U.S.C. § 78c(a)(10) ("The term 'security' means

any . . . investment contract . . . ."). "'Investment contract' is not itself defined."

Edwards, 540 U.S. at 393, 124 S. Ct. at 896. "The meaning of 'investment

contract' is a question of law reviewed de novo." SEC v. Merchant Capital, LLC,

483 F.3d 747, 754 (11th Cir. 2007).

In SEC v. W.J. Howey Co., the Supreme Court explained that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. 293, 298–99, 66 S. Ct. 1100, 1103 (1946). "This Court has divided the Howey test into the three elements: (1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others." SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1199 (11th Cir. 1999). This appeal centers on the third prong—whether the Plaintiffs "expect[ed] . . . profits to be derived solely from the efforts of others."

"Although the [Supreme] Court used the word 'solely' in the Howey decision, it should not be interpreted in the most literal sense." Williamson v. Tucker, 645 F.2d 404, 418 (11th Cir. 1981).[7] Instead the test is "'whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" Id. (quoting SEC v. Glenn W. Turner Enters., 474 F.2d 476, 482 (9th Cir. 1973)). "An interest thus does not fall outside the definition of investment

_____

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down before the close of business on September 30, 1981.

contract merely because the purchaser has some nominal involvement with the operation of the business. Rather, the focus is on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other third party." Merchant Capital, 483 F.3d at 755 (quotation marks omitted). "An investor who has the ability to control the profitability of his investment, either by his own efforts or by majority vote in a group venture, is not dependant upon the managerial skill of others." Gordon v. Terry, 684 F.2d 736, 741 (11th Cir. 1982).

"Under the precedent of this circuit, the crucial inquiry is the amount of control that the investors retain under their written agreements." Albanese v. Fla. Nat. Bank of Orlando, 823 F.2d 408, 410 (11th Cir. 1987). But "Williamson v. Tucker . . . articulates a narrow exception to the general rule" that an investment contract does not exist where "[t]he written agreements . . . place control over all significant decisions in the hands of the investors." Gordon, 684 F.2d at 741. "[U]nder certain circumstances an investor may be incapable of exercising a power given by a written agreement." Id. Thus, this Court has recognized that the third prong of the Howey test may be satisfied where any control apparently exercised by the investor under the terms of the agreement is merely illusory. Albanese, 823 F.2d at 412 ("Even if the agreements' words did grant the investors sufficient potential control [over the management of their investments] to prevent

14

the agreements from being securities, the record demonstrates that, in fact, any such control was illusory because plaintiffs had no realistic alternative . . . .”).  So, “[c]onsistent with Howey’s focus on substance over form, we look at all the representations made by the promoter in marketing the interests, not just at the legal agreements underlying the sale of the interest.”  Merchant Capital, 483 F.3d at 756.

We begin with the “crucial inquiry” of “the amount of control that the investors retain under their written agreements.”  Albanese, 823 F.2d at 410.  The purchase agreements here reveal that Plaintiffs retained a great deal of control.  In fact, the only significant limitation specified in the purchase agreements themselves is the one-year holding period.  In all other respects the agreements treat Plaintiffs as ordinary real estate purchasers.  Plaintiffs are free, under the terms of the contract, to reside in the units or to rent them out.  If they choose to rent out the units, the agreements in no way obligate Plaintiffs to contract with OMC or any other property manager.  Given the otherwise extensive control Plaintiffs enjoy under the agreements, we cannot say that the holding period alone would be sufficient to establish Howey’s third prong.

Plaintiffs argue that the control over the management of the properties afforded to them by the purchase agreements is merely illusory.  To support this

contention, they point to their allegation in the complaint that OMC was "the exclusive rental agent for the units, which meant that the investors had no control of the rental of the units or the operation of Vista Cay and The Isles." But, as set out above, the purchase agreements state in no uncertain terms that Plaintiffs are under no contractual obligation to join the rental pool or otherwise contract with OMC. In articulating the exception for illusory control, Williamson carefully "emphasize[d] . . . that a reliance on others does not exist merely because the [investors] have chosen to hire another party to manage their investment. The delegation of rights and duties—standing alone—does not give rise to the sort of dependence on others which underlies the third prong of the Howey test." 645 F.2d at 423. That is the situation here, where Plaintiffs have not alleged that no reasonable alternative to OMC existed for the rental management of the units.[8] Absent some allegation that purchase of the units was conditioned, either contractually or by practical necessity, on the entry into the rental agreements with OMC, these rental agreements constitute a separate, voluntary delegation of managerial control by Plaintiffs—that is, an exercise of the control over the investment which Plaintiffs expressly retained under their purchase agreements.

_____

[8] Indeed, to the contrary, Plaintiffs' amended complaint reveals that they were able to enlist the services of another property manager after OMC's alleged breach of the agreement.

16

Considering all of this, we agree with the District Court that the separate rental

agreements with OMC were not indicative of a lack of control, but rather

reflective of Plaintiffs' voluntary exercise of the control they retained under the

agreements.  As a result, we conclude that under the purchase agreements

Plaintiffs did not relinquish control over their investment to the point that they

were "dependent upon the managerial skill of others."  Gordon, 684 F.2d at 741.[9]

---

[9] Plaintiffs argue that this conclusion conflicts with existing SEC guidelines.  Those guidelines state:

> [T]he offering of condominium units in conjunction with any one of the following will cause the offering to be viewed as an offering of securities in the form of investment contracts:
> 1. The condominiums, with any rental arrangement or other similar service, are offered and sold with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of the promoter, or a third party designated or arranged for by the promoter, from rental of the units.
> 2. The offering of participation in a rental pool arrangement; and
> 3. The offering of a rental or similar arrangement whereby the purchaser must hold his unit available for rental for any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit.
> In all of the above situations, investor protection requires the application of the federal securities laws.

Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development, Securities Act, Release No. 33-5347, 1973 WL 158443 (Jan. 4, 1973).  The District Court noted the potential conflict between these guidelines and the case law, and explained that

> [a]lthough the SEC's guidelines purport to be Howey-based, in some respects they seem more liberal than the Howey test (as developed by the lower courts) for determining when an investment contract exists.  In particular, literal application of the first numbered paragraph in the SEC guidelines . . . could conceivably yield a finding that an investment contract exists irrespective of whether the investor retains control over the property.  To the extent that the SEC guidelines conflict with Howey, the Court is duty-bound to follow Howey.

17

But, as Plaintiffs correctly contend, we may not look only to the purchase agreements, but must instead consider the whole transaction or scheme, including the other representations made by the defendants.  See Merchant Capital, 483 F.3d at 756.  Plaintiffs argue that the "exclusive rental agreements" with OMC combine with the condominium purchase from Pulte to form a single scheme under which Plaintiffs were left with no significant control over their investment.  Plaintiffs are correct that this Court's precedents require examination of representations made by promoters beyond the actual contract itself.  In asserting their claims against Pulte, Plaintiffs cannot create an investment contract by bootstrapping their separate voluntary transaction with OMC to their condominium purchase from Pulte.  Plaintiffs, on the other hand, repeatedly allege that The Wear Group and Mr. Wear were agents of Pulte.  Of course, "conclusory allegations . . . or legal conclusions masquerading as facts will not prevent dismissal."  Davila v. Delta Air

We agree with the District Court.  The guidelines are not entitled to deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778 (1984).  See Christensen v. Harris Cnty., 529 U.S. 576, 587, 120 S. Ct. 1655, 1662–63 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-style deference.").  They "are entitled to respect under . . . . Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S. Ct. 161[, 164] [] (1944), but only to the extent that those interpretations have the power to pursuade."  Christensen, 529 U.S. at 587, 120 S. Ct. at 1663 (quotation marks omitted).  To the extent that Release 5347 would suggest a different outcome in this case, it is only because it ignores Howey and its progeny's focus on the control retained by the condominium purchaser.  Thus, to the extent the release conflicts with the controlling case law, the District Court properly rejected it as unpersuasive.

Lines, Inc., 326 F.3d 1183, 1185 (11th Cir. 2003); see also Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) ("Although it must accept well-pled facts as true, the court is not required to accept a plaintiff's legal conclusions."). However, Plaintiffs have alleged sufficient facts to render it facially plausible that Pulte participated in promoting, or was affiliated with, the rental pool so that an agency relationship was therefore present.

First, Plaintiffs allege that Pulte offered a preferred lender program that accommodated the rental program. While this conduct is consistent with the promotion of the rental pool, it is also consistent with the promotion of its purchase agreements standing alone, which would not give rise to securities liability. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 553–57, 127 S. Ct. 1955, 1964–66 (2007) (explaining that there is a "need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement" to state a claim under § 1 of the Sherman Act, where liability depends on proof of an agreement). Second, Plaintiffs allege that a promotional article on The Wear Group's website purported to quote "a Pulte Representative" as stating that Pulte was "proud to team up with Wear Group Realty." Third, Plaintiffs include as an exhibit in their amended complaint a document bearing the corporate insignias of both The Wear Group and Pulte, stating *"[i]nvestments like this come along once*

19

*in a lifetime. The Wear Group, Pulte Homes (NYSE: PHM) and Osceola*

*Management have teamed up for what could be the best opportunity in history for*

*Real Estate Investors.*"  Finally, Plaintiffs allege that "PULTE enlisted . . . WEAR

and WEAR GROUP [ ] to sell the investment contracts to investors," and that The

Wear Group earned a "commission from each sale of those units."  Indeed, the

purchase agreements between Pulte and plaintiffs Jerry and Jessica Craft inform

the purchasers that "[s]eller will pay a commission of 15% + $30,000 Marketing

Fee plus $10,000 Bonus of the purchase price to The Wear Group . . . .  Buyer

agrees that Broker [The Wear Group] is acting as an agent on behalf of Seller

[Pulte]."  Similar language can be found in the purchase agreements with other

plaintiffs.  While Plaintiffs' allegations may not establish that Pulte was complicit

in promoting a larger investment scheme, in the context of a 12(b)(6) Motion to

Dismiss, Plaintiffs need only "nudge[ ] their claims across the line from

conceivable to plausible."  Twombly, 550 U.S. at 570, 127 S. Ct. at 1974.

Plaintiffs have succeeded in pleading enough facts to make it plausible, despite the

numerous disclaimers in Pulte's purchase agreements, that Pulte was linked to the

other defendants in the promotion of the properties as investment opportunities.

Thus, when we view the transaction through the lens of the purchase

agreements with Pulte, Plaintiffs retained control over the management of the

20

property and exercised that control by contracting with OMC. However, viewing the larger scheme through the lens of the representations made by The Wear Group, as Pulte's alleged agent, and the rental agreements with OMC—which were entered into before closing on the condominium units—the transaction as alleged does have the elements of an investment contract. OMC argues that "[a]t best, this arrangement could be described as some form of lease-back agreement not between the owner and the original developer, . . . but between the Plaintiff[s] and [their] property manager, OMC." Accepting Plaintiffs' factual allegations, as we must, we agree with this characterization of the transaction. The alleged promotional representations of The Wear Group and the rental program alleged to be administered by OMC required that each plaintiff purchase a condominium unit from Pulte and then, in effect, lease that unit to, or at least through, OMC. In Edwards, the Supreme Court held that a lease-back agreement for payphones could qualify as an investment contract under the Securities Act, even though the investment would produce a fixed rather than variable return and the investors were contractually entitled to that return. 540 U.S. at 391–97, 124 S. Ct. 895–98.

OMC attempts to distinguish Edwards because "OMC was not using the funds of subsequent purchasers to pay returns to earlier purchasers and Plaintiffs in this case retained substantial control over their condominium units." But the

fact that "OMC was not using the funds of subsequent purchasers to pay returns to earlier purchasers" does not suffice to distinguish Edwards. Certainly, in describing how the payphone lease-back agreements at issue in that case went bad, the Edwards Court explained that "[t]he payphones did not generate enough revenue for [the company leasing the phones] to make the payments required by the leaseback agreements, so the company depended on funds from new investors to meet its obligations." Id. at 392, 124 S. Ct. at 896. But, this description of the eventual breach of the agreements and alleged violations of securities laws was merely background information in that case, and in no way relevant to the Court's analysis of whether the transaction itself constituted an investment contract. See id. at 394–97, 124 S. Ct. 897–98.

We also reject OMC's argument that Plaintiffs retained substantial control over the condominium units. Certainly, as described above, Plaintiffs did retain extensive control over the units under the purchase agreements. But to participate in the scheme allegedly promoted by The Wear Group, Plaintiffs needed to contract with OMC for the management of the properties as short-term rental

22

units. And once they had so contracted with OMC, Plaintiffs no longer retained significant control over their units, and in turn, over their investments.[10]

We emphasize again that the allegations as to Pulte's purchase agreements alone are not sufficient to state a claim under securities laws, because the transaction with Pulte did not require Plaintiffs to participate in any rental agreement or contract with OMC for the management of the property. If this were, like Edwards, a case involving payphones rather than condominiums, Pulte would have been nothing more than an exclusive third-party supplier of the brand of payphones that the promoter required for participation in a modified lease-back scheme. The use of a third-party supplier would neither insulate the promoter from securities liablity, nor by itself transform the purchase of equipment from the third-party supplier into an investment contract that would bring that supplier's

---

[10] OMC argues that the Plaintiffs did have significant control because they were "encouraged . . . to participate in the process of obtaining guests and bookings for their unit." Specifically, OMC informed Plaintiffs that they could use OMC's website to "to see [their] future reservations and make reservations [themselves]." We reject OMC's suggestion that this is a sufficient amount of control to prevent Plaintiffs from satisfying Howey's third prong. In Albanese, for example, we concluded that the investors' power to decide where to place the ice machines they had purchased from and leased back to the seller-lessee was "too insubstantial to disqualify the agreements as securities," because "the investors were dependent upon [the seller-lessee's] expertise and labor in arranging the placement," and the seller-lessee "offered its expertise in finding locations, contracting with the hotels and other institutions, servicing the machines, and accounting for the profits." 823 F.2d at 412. Similarly, Plaintiffs here relied on OMC's expertise and efforts in locating and securing tenants and managing the properties. We conclude that Plaintiffs' ability to make reservations through OMC's website is "too insubstantial to disqualify the [rental] agreements as securities."

conduct within the scope of federal securities laws.[11]  But, Plaintiffs successfully

allege that Pulte was affiliated with The Wear Group's promotion of OMC's rental

agreements.

For these reasons, we conclude that while Plaintiffs have not alleged facts

necessary to establish an investment contract as to Pulte's purchase agreements

standing alone, they have sufficiently alleged the existence of an investment

contract as to OMC, Mr. Murphy, The Wear Group, and Pulte as an affiliate of

those defendants.

IV.

Plaintiffs also argue that the District Court erred in considering the purchase

agreements, which were not attached to the amended complaint, but rather were

attached to Pulte's motion to dismiss.  Under the "incorporation by reference"

doctrine, "a document attached to a motion to dismiss may be considered by the

---

[11] We observe that this case arises from facts somewhat similar to those at issue in Hocking, 885 F.2d 1449.  In that case, the plaintiff relied on the expertise and representations of a real estate agent to purchase a condominium unit from private sellers on the secondary market and contracted with another company for the management of the unit and participation in a rental pool.  Id. at 1452–53.  The Ninth Circuit, sitting en banc, determined that the district court erred in granting summary judgment in favor of the defendant real estate agent on the grounds that the transaction did not constitute an investment contract.  Id. at 1462.  The Ninth Circuit stated that "[t]here is no doubt that, had [the plaintiff] purchased the condominium and the rental pool directly from the developer and an *affiliated* rental pool operator, and had the rental pool been for a long term without any provision for early termination, [the plaintiff] would have purchased a security."  Id. at 1456 (emphasis added).  In this case, Plaintiffs have adequately alleged that the rental pool managed by OMC and promoted by the Wear Group was affiliated with Pulte.

court without converting the motion into one for summary judgment only if the attached document is (1) central to the plaintiff's claim; and (2) . . . . the authenticity of the document is not challenged." Horsley v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002). As the authenticity of the purchase agreements is not challenged, the only issue is whether the purchase agreements are "central to the plaintiff[s'] claim[s]."

Plaintiffs argue that the agreements were not central to their claims, which were based on an investment contract arising from a broader scheme consisting of a variety of representations outside of the purchase agreements. Thus, Plaintiffs argue that their "securities claims did not rely on a violation of the Purchase Agreements nor did [they] allege that the Purchase Agreements alone constituted investment contracts." We disagree with Plaintiffs' contention that the purchase agreements were not central to their claims. Without considering the agreements, it would be impossible for the District Court to evaluate properly how much control Plaintiffs exercised over their investments, which turns out to be a crucial issue in this case. See Albanese, 823 F.2d at 410 (explaining that "the crucial inquiry is the amount of control that the investors retain under their written agreements"); see also SFM Holdings, Ltd. v. Banc of Am. Sec., LLC, 600 F.3d 1334, 1337 (11th Cir. 2010) (holding that "relationship-forming contracts are

25

central to a plaintiff's claim"). Moreover, Plaintiffs attempt to establish the "investment of money" prong of the Howey test on the basis of their purchase of the condominium units, and the relief they seek includes recision of these contracts. We conclude that the District Court did not err in considering the purchase agreements because those agreements are central to Plaintiffs' securities claims.

## V.

For all of these reasons, we reverse the District Court's dismissal of the remaining federal and state claims against Pulte, OMC, Mr. Murphy, and The Wear Group, and we remand this case to the District Court for further proceedings consistent with this opinion.[12]

**REVERSED and REMANDED.**

---

[12] We observe that the defendants moved to dismiss the claims on various alternate grounds that were not reached by the District Court. See supra notes 3–5 and accompanying text. We do not decide these issues, but instead remand to the District Court to consider them in the first instance.

26